UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| BLESSING IN THE SKY, LLC and TRIPLE R HOLDINGS, LLC, <br><br> Plaintiffs, <br><br> v. <br><br> ALL BLUES, INC., BARRON RUTH, UNLIMITED DEVOTION, INC., and PATRICK MAY, <br><br> Defendants. | Civil Action No. <br><br> _____ <br><br> **JURY TRIAL DEMANDED** |

## <u>VERIFIED COMPLAINT FOR DAMAGES</u>

Blessing in the Sky, LLC and Triple R Holdings, LLC (collectively,

Plaintiffs) file their Verified Complaint for Damages against All Blues, Inc.,

Barron Ruth, Unlimited Devotion, Inc., and Patrick May alleging as follows:

### I.    PARTIES, JURISDICTION, AND VENUE

1.    This is an action for breach of contract, fraudulent misrepresentation

and concealment, breach of a fiduciary duty, tortious interference with contractual

and/or business relations, conversion, unjust enrichment, civil conspiracy/aiding

and abetting, injunctive relief, and specific performance. Plaintiffs seek

damages in excess of $75,000.00, exclusive of costs, interest, and attorneys' fees; and other equitable relief.

2.     Plaintiff Blessing in the Sky, LLC ("BITS") is a Florida limited liability company.

3.     Plaintiff Triple R Holdings, LLC ("Triple R") is a Tennessee limited liability company.

4.     Defendant Barron Ruth is a Georgia resident and may be served with process at 308 River Glen Drive, Roswell, Georgia 30075.

5.     Defendant All Blues, Inc. ("All Blues") is a for-profit, Georgia corporation with its principal place of business located at 308 River Glen Drive, Roswell, Fulton County, Georgia. All Blues may be served with process through its designated agent for service, Defendant Barron Ruth, at 308 River Glen Drive, Roswell, Georgia 30075.

6.     Defendant All Blues is solely owned, managed, and controlled by and is an alter ego of Defendant Barron Ruth, and there is a sufficient unity of interest and ownership between each of them such that the acts of one are for the benefit of and can be imputed to the other and neither can avoid legal responsibility for actions taken by the other. Defendant Barron Ruth has used the corporate form of Defendant All Blues to accomplish unjust and fraudulent results and should be

2

held jointly and severally liable for all damages incurred by Plaintiffs as a result of any unlawful actions or omissions by Defendants.

7.      Defendant Patrick May is a resident of Maine and may be served with process at 160 Milton Street, Portland, Maine 04103.

8.      Defendant Unlimited Devotion, Inc. ("Unlimited Devotion") is a for-profit Maine corporation with its principal place of business located at 160 Milton Street, Portland, Cumberland County, Maine 04103. Unlimited Devotion may be served with process through its designated agent for service, Defendant Patrick May, at 160 Milton Street, Portland, Maine 04103.

9.      Defendant Unlimited Devotion is solely owned, managed, and controlled by and is an alter ego of Defendant Patrick May, and there is a sufficient unity of interest and ownership between each of them such that the acts of one are for the benefit of and can be imputed to the other and neither can avoid legal responsibility for actions taken by the other. Defendant Patrick May has used the corporate form of Defendant Unlimited Devotion to accomplish unjust and fraudulent results and should be held jointly and severally liable for all damages incurred by Plaintiffs as a result of any unlawful actions or omissions by Defendants.

3

10.     Each party submits to the jurisdiction of the courts of the State of Georgia.

11.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a) because the amount in controversy exceeds the sum of $75,000.00, exclusive of interests and costs, and the action is between citizens of different states.

12.     This Court has personal jurisdiction over Defendants because at all relevant times they have conducted substantial business operations within this District and throughout Georgia.

13.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because a substantial part of the events or occurrences giving rise to this claim occurred in this District.

## II.     FACTUAL ALLEGATIONS

14.     On July 11, 2013, BITS, Triple R, All Blues, and Unlimited Devotion filed Articles of Incorporation with the Georgia Secretary of State to form Crossover Touring, LLC ("Crossover"), which is a member-managed, Georgia limited liability company that represents musical artists in the entertainment industry in the booking of live performances.

15.     On August 11, 2013, BITS, Triple R, All Blues, and Unlimited Devotion executed an Operating Agreement, the terms and conditions of which govern the four members within Crossover. *See* Exhibit A, Operating Agreement of Crossover Touring, LLC.

16.     Throughout the Operating Agreement, Defendants All Blues and Barron Ruth are referred to interchangeably.

17.     Throughout the Operating Agreement, Defendants Unlimited Devotion and Patrick May are referred to interchangeably.

18.     The parties formed Crossover for the purpose of negotiating and contracting live performance engagements for an exclusive roster of clients.

19.     In representation of its artists and to facilitate live performance engagements, Crossover pitched, secured, and arranged artists' performances and negotiated deals, collected deposits, and held options on dates and times for performances.

20.     Regarding Crossover's business model, which is implicit in the Operating Agreement's terms for agent compensation, the parties agreed to operate with a territorial/team approach, meaning different agents represented artists for performances within specific territories, regions, or venue types. The parties agreed to this philosophy to maximize, for the benefit of Crossover's clients, the expertise,

5

network, and clout of each territorial/agent and the ability of multiple people to accomplish critical tasks in a timely manner. The parties further agreed that any change in this "general philosophy of the company shall be by unanimous consent of the members or [a supermajority] of the board of directors."

21.     At inception, the parties contemplated any potential conflicts of interest between Crossover and its members and, while agreeing to "maintain loyalty" to Crossover, acknowledged that Crossover's members would "not deviate from their normal management function" within other organizations of which they are members. The parties also acknowledged in the Operating Agreement that BITS "manage[d] artists that for various reasons may be represented by other booking agencies."

22.     According to the Operating Agreement, the four Crossover members made the following "Capital Contributions" to the company at or near inception:

- BITS: $50,000 monetary contribution, plus "serv[ing] as advisor to [the] President in all operations;"

- Triple R: $100,000 monetary contribution;

- All Blues/Barron Ruth: client roster generating "[a]pproximately $350,000 to $400,000 in earnings in year one," plus serving as "Agent/Partner . . . charged with creating and executing the vision of Crossover Touring[,] LLC in conjunction with all members of the LLC;"

- Unlimited Devotion/Patrick May: anticipated annual commissions of approximately $200,000, plus serving as the member "responsible for booking and signing clients, as well as shaping the culture of the agency."

23.     The parties agreed that Crossover would be a member-managed entity.

24.     The parties also agreed that Crossover's net profits and losses, "as determined by generally accepted accounting principles," would be distributed between the members in the following manner, with tax allocations in the same fixed proportions:

| Member | Profit/Loss Percentage |
|---|---|
| All Blues/Barron Ruth | 40% |
| BITS | 20% |
| Triple R | 20% |
| Unlimited Devotion/Patrick May | 20% |

25.     The parties agreed that Crossover's distributions would be made according to the following schedule and that *no member would have priority over any other member* for the distribution:

- BITS: 20% of Gross Income;

- Triple R: 20% of Gross Income;

- All Blues/Barron Ruth and Unlimited Devotion/Patrick May: 60% of Gross Income "to run the business operations and be compensated for their results via commissions plus equity."

26.     Defendants Barron Ruth and Patrick May received compensation for their services to Crossover through partner distributions made to their corporate entities, Defendants All Blues and Unlimited Devotion, respectively.

27.     The parties agreed to hold regular member meetings in "January and July of each calendar year or as otherwise designated," and all members were required to be present (or prior written consent of the absent members obtained) "for any decisions to be binding." The parties also agreed that board meetings, to be comprised of seven persons including all parties, would be held "not less than semi-annually."

28.     The parties also agreed that each member would "devote such time and attention to the business of the Company as the majority of the Members will from time to time reasonably determine for the conduct of the Company business."

29.     According to the Operating Agreement, the following actions, among others, required the "unanimous consent of all members":

- Incurring company liabilities over $10,000;

- Incurring a single transaction expense over $5,000; and

- Hiring an employee with an annual compensation over $30,000.

8

30.     In the event of a buyout of any member's interest, the parties agreed that Crossover's value would be based on "the fair market value appraisal [conducted by an independent accounting firm agreed to by all members] of all Company assets (less liabilities) determined in accordance with generally accepted accounting procedures."

31.     The parties agreed that Crossover's funds would be "held in the name of the Company and [would] not be commingled with those of any other person or entity."

32.     Pursuant to the Operating Agreement:

- "Accurate and complete books of account of the transactions of the Company will be kept and at all reasonable times be available and open to inspection and examination by any Member;"

- "Each Member has the right to demand" a copy of "[i]nformation regarding the status of the business and the financial condition of the Company;"

- "[A]ll [M]embers will have the ability to see the [operations] account;"

- "Any of the Members will have the right to request an audit of the Company books;" and

- "As soon as practicable after the close of each fiscal year, the Company will furnish to each Member an annual report showing a full and complete account of the condition of the Company."

33.     The parties agreed that Barron Ruth and Patrick May would operate Crossover within a financial budget approved annually by the members.

34.     The parties agreed that Crossover could only borrow money with the unanimous consent of the four members, or a supermajority vote by Crossover's board of directors.

35.     The parties agreed that any amendments to the Operating Agreement could only be made by unanimous consent of the four members, or a supermajority vote by Crossover's board of directors.

36.     By the end of 2016, Crossover had gotten behind in paying BITS and Triple R their share of the agreed-upon distribution, and, pursuant to the Operating Agreement, their deferred distribution amounts accumulated as a debt to the company. The parties originally agreed that any such liabilities would be "repaid with interest at such rates and times to be determined by a majority of the Members."

37.     On December 22, 2016, in order to acquire more agents to build Crossover's territorial/team representation model and alleviate any financial impediments, BITS and Triple R agreed to amend paragraph 8 of the Operating Agreement such that Crossover's distributions would be made according to the following modified schedule:

- BITS: 20% of Net Income (after deducting all operating expenses, including guaranteed salary payments to Barron Ruth and Patrick May);

- Triple R: 20% of Net Income;

- All Blues/Barron Ruth: 40% of Net Income;

- Unlimited Devotion/Patrick May: 20% of Net Income.

At that time, the parties reiterated and consented in writing that, pursuant to and in conjunction with the Operating Agreement, "no distributions can be made without distributions being made to all LLC Members."

38.     The parties also agreed on December 22, 2016, that all accumulated debt from years 2014, 2015, and 2016 shall be paid in "not less than 4 years."

39.     The parties held a board meeting on January 8, 2018, and approved Crossover's 2018 budget for operating expenses.

40.     The parties held a board meeting in the fourth quarter of 2018 and approved Crossover's 2019 budget for operating expenses.

41.     As of December 31, 2019, Crossover's line of credit with First Tennessee Bank totaled $0.00.

42.     The parties held a board meeting on January 20, 2020, and failed to approve Crossover's 2020 budget for operating expenses.

43.     Crossover's 2020 budget for operating expenses was never subsequently approved by the board members, nor was a resolution passed authorizing temporary funding in accordance with the previous year's budget, yet Defendants spent corporate monies throughout 2020 without authorization.

44.     The parties have not held a regular member meeting or board meeting since January 20, 2020.

45.     On April 8, 2020, Crossover received a Paycheck Protection Program (commonly referred to as "PPP") loan, backed by the federal Small Business Administration ("SBA"), in the amount of $185,697.00. In order to receive this allocation, Crossover certified to the federal Government that it employed nine (9) individuals that were eligible for the PPP funds.

46.     However, at that time, Crossover only employed seven (7) salaried individuals, not including Defendants Barron Ruth and Patrick May, who had been compensated for their services to Crossover, as per the Operating Agreement, through distributions to All Blues and Unlimited Devotion, respectively. In 2020, to take advantage of the PPP funds, Defendants changed Crossover's accounting structure, without notice to or approval from Plaintiffs, so that Defendants Barron Ruth and Pay May received compensation for their services individually as salaried, payroll employees.

47.    On April 18, 2020, Defendant Barron Ruth indicated Defendants'
desire to dissociate with BITS and Triple R, yet maintain the name and legal
identity of Crossover. Defendant Barron Ruth indicated that he and Defendant
Patrick May were "open to coming up with an acceptable financial arrangement"
for Plaintiffs but suggested that their interest in Crossover had no value.

48.    Soon thereafter, despite the Operating Agreement's clear designation
of Crossover's member-managed corporate structure where the four members had
collective control over company decisions, Defendants, without notice to or
approval from Plaintiffs, changed Crossover's management structure to a manager-
managed one and began making unilateral company decisions. Crossover's four
members did not vote on or approve of this change, and Defendants did not file an
amendment to Crossover's articles of organization with Georgia's Secretary of
State's office regarding this change.

49.    Also thereafter, and increasingly since 2018, Defendant Patrick May
transitioned from Crossover's territorial/team representation model, whereby he
primarily booked artists at West Coast, Northeast, and Midwest shows, to a
primarily agent-centric model, whereby he solely represented certain chosen
clients, to the detriment and at the expense of Crossover's other clients.
Specifically, Defendant Patrick May represented one of the music industry's top

emerging artists, who began generating significant profit for Crossover, and neglected Crossover's other talented artists that were in desperate need of vigorous representation and performance opportunities due to the COVID-19 pandemic. Plaintiffs did not approve or authorize this change in Crossover's foundational philosophy of utilizing a territorial/team representation model in its business practices. Defendant Patrick May also refused to communicate or meet with Plaintiffs despite repeated requests.

50.     Defendant Barron Ruth also began transitioning Crossover away from its territorial/team representation model, despite not having the unanimous consent of its members or a supermajority of its board of directors.

51.     On April 18, 2020, Defendant Barron Ruth stated that Crossover's valuation "is probably negative given the debt."

52.     On April 23, 2020, Defendant Barron Ruth sent Crossover's board of directors a progress report, indicating that Crossover had laid off five employees and anticipated laying off an additional four employees by June; had obtained approximately $185,000.00 in PPP funds, the majority of which would be forgiven; and anticipated a 25 to 50 percent pay cut in the remaining employees' salaries.

53.     Plaintiffs received their last distribution from Crossover in the amount of $3,208.33 on April 30, 2020.

54.     On May 18, 2020, Defendant Barron Ruth confirmed by email to the board of directors that Crossover had implemented a 50 percent pay cut in employee salaries. Upon information and belief, Defendants Barron Ruth and Patrick May did not take a 50 percent pay cut, despite classifying themselves as salaried, payroll employees in Crossover's PPP application.

55.     As of May 31, 2020, Crossover's line of credit with First Tennessee Bank had increased to $175,000.00.

56.     As of August 31, 2020, Crossover's line of credit with First Tennessee Bank had increased to $200,000.00.

57.     On October 1, 2020, Defendants offered Josh Brinkman a new employment agreement with an annual compensation over $30,000.00 without Plaintiffs' knowledge and without obtaining the unanimous consent of all members in compliance with the Operating Agreement.

58.     On November 3, 2020, Plaintiffs expressly denounced any change in Crossover's territorial/team representation model and cautioned Defendants about any conduct that would breach this agreement, which was made at Crossover's inception and which had contributed to Crossover's success.

15

59.     As of December 31, 2020, Crossover's line of credit with First Tennessee Bank had increased to $225,000.00.

60.     Crossover's 2021 budget for operating expenses was never approved by the board members, nor was a resolution passed authorizing temporary funding in accordance with the previous year's budget, yet Defendants spent corporate monies throughout 2021 without authorization.

61.     On January 8, 2021, Defendants assured Plaintiffs that Crossover was still utilizing "a team to assist in maximizing opportunities . . . for all Crossover Touring artists." When Plaintiffs asked for specific details to support Defendants' claims that Crossover was still maintaining its territorial/team representation model, Defendant Barron Ruth reiterated Crossover's "team" approach.

62.     On April 5, 2021, Plaintiffs informed Defendants in writing that they did not have approval or authorization to use Crossover's funds to pay for legal counsel regarding Defendants' desire to dissociate with Plaintiffs.

63.     On April 30, 2021, Plaintiffs asked Defendants to provide certain financial documents, including, but not limited to, Crossover's projected income reports for 2021 and 2022. On May 3, 2021, Crossover's chief financial officer, Lorri Palko, provided Plaintiffs with certain financial documents related to

Crossover's operating accounts but failed to provide the requested projected income reports for 2021 and 2022.

64.     On May 17, 2021, Plaintiffs informed Defendants in writing that they were in breach of the Operating Agreement by detailing numerous specific violations, including, but not limited to, failing to pay Plaintiffs their share of Crossover's gross commissions; borrowing money from Crossover's line of credit without authorization; taking unauthorized draws and payroll disbursements; denying Plaintiffs full access to Crossover's complete books of account; incurring unauthorized liabilities in excess of $5,000.00; hiring employees without authorization; failing to devote the necessary time and attention to all of Crossover's clients; and changing the philosophy of the company without consent. Plaintiffs asked Defendants at that time to correct the violations and honor the terms of the Operating Agreement. Plaintiffs also warned Defendants that any efforts to transition away from Crossover's territorial/team representation model to an agent-centric model would result in Crossover's loss of the continued representation of two artists managed by Plaintiff BITS.

65.     Also on May 17, 2021, Plaintiffs informed Ms. Palko in writing that she was not permitted to distribute any of Crossover's funds, including any grant funds, to pay for liabilities in excess of $5,000.00 without the authorization or

approval of Plaintiffs, which was in accordance with Crossover's Operating Agreement that required the unanimous consent of the four Members, or a supermajority vote by Crossover's board of directors.

66.     On May 21, 2021, Defendants, through counsel, sent Plaintiffs a "notice of the involuntary termination of the membership interests of [BITS and Triple R] in Crossover Touring, LLC . . . ." In addition, Defendants informed Plaintiffs that they were hiring two new employees, without first obtaining the "unanimous consent of all Members" as required by the Operating Agreement. Defendants again represented that Crossover's value was negative and that Plaintiffs would be required to contribute over $100,000.00 to Crossover in the event of a company dissolution to cover purported liabilities.

67.     As of May 31, 2021, Crossover's line of credit with First Tennessee Bank had increased to $255,000.00.

68.     Since 2020, Defendants advanced themselves money from Crossover's line of credit with First Tennessee Bank without notice to or approval from Plaintiffs and failed to acknowledge such draws as debts owed to the company.

69.     On June 9, 2021, three artists, managed by Plaintiff BITS, terminated Crossover's agency representation due to Defendants' transition from a

18

territorial/team representation model to an agent-centric model, which negatively impacted the number of bookings the artists received.

70.     On June 10, 2021, Plaintiffs again asked Defendants to provide certain financial documents, including, but not limited to, a complete copy of Crossover's: application for federal grant funds issued through the Shuttered Venue Operators Grant ("SVOG") Program established as part of the Consolidated Appropriations Act and amended by the American Rescue Plan Act; bank and investment account statements from January 1, 2020 forward; capital and drawing account statements; minutes from board and member meetings; and tax returns. To date, Defendants have only provided partial information related to these documents to Plaintiffs.

71.     Also on June 10, 2021, in furtherance of discussions regarding Defendants' desire to dissociate with BITS and Triple R, Plaintiffs provided Defendants with a right of first purchase buy-out option, offering to sell their combined 40% interest in Crossover for a discounted amount, considering that Crossover's value at that time was approximately $6,000,000.00.

72.     On June 24, 2021, Defendant Barron Ruth himself terminated Crossover's agency representation of two more award-winning and high-revenue-generating artists, also managed by Plaintiff BITS, based on their management

company's "philosophy of territorial agents" and "insistence on a territorial

system" of representation, which Crossover was no longer utilizing.

73.    On June 30, 2021, Defendants unilaterally retained Fair Value

Advisors, LLC ("FVA") to provide "valuation assistance related to Crossover." In

addition, Defendants agreed, without approval or authorization from Plaintiffs, to

pay a $5,000.00 initial retainer to FVA on behalf of Crossover, which would be

applied toward a final invoice of an undetermined amount.

74.    On July 9, 2021, and unbeknownst to Plaintiffs, Crossover received

$646,559.00 in SVOG funds. Thereafter, Crossover received a supplemental

amount of $323,279.00 in SVOG funds, and in February 2022, Crossover received

additional SVOG funds in the amount of $2,496,640.00, bringing its total SVOG

grant award to $3,466,478.00 as of March 7, 2022.

75.    On or about July 14, 2021, another artist, who was generating

approximately $40,000.00 to $50,000.00 in revenue for Crossover, terminated

Crossover's agency representation due to Defendants' agent-centric model and

Defendant Patrick May's failure to devote the necessary time and attention to the

artist, which negatively impacted the number of bookings the artist received.

76.    On August 19, 2021, Defendant Barron Ruth provided Plaintiffs with

a copy of their 2020 Schedule K-1 for Crossover, which changed the designation

20

of Plaintiffs' guaranteed payments as partners, subjecting them to unnecessary

taxes on this income. Plaintiffs did not approve of, nor were they notified prior to,

this change in their tax status with Crossover.

77.     On October 5, 2021, based on Defendants' refusal to provide

Crossover's full and complete financial information, Plaintiffs requested an audit

of Crossover's books "at the earliest opportunity," but Defendants have not

permitted Plaintiffs' request. Instead, on October 12, 2021, Defendants, through

counsel, sent Plaintiffs a purported "buyout notice" based on Defendants'

unilateral appraisal performed by FVA and included redacted, incomplete

documents upon which the appraisal was based.

78.     On October 12, 2021, Defendants, through counsel, sent each Plaintiff

a check in the amount of $15,193.64 to purportedly account for Crossover's

delayed distribution payments for October, November, and December of 2015.

Defendants also attempted to buy out Plaintiffs' interest in Crossover for an

undervalued amount, based upon an inaccurate appraisal derived from Defendants'

provision of partial and misleading information to FVA regarding Crossover's

value.

79.     On November 19, 2021, Plaintiffs informed Defendants that Reliant

Talent Agency ("Reliant") was interested in acquiring their combined 40% interest

in Crossover under the terms previously offered to Defendants and requested Defendants' cooperation in discussing the buy-out and transition with Reliant's owner Steve Lassiter. Plaintiffs also communicated with Defendants the option of selling their combined interest to Bill Orner and the Crossover artist he represents. Defendants refused to cooperate or engage in any discussions regarding Plaintiffs' proposals.

80.    On November 23, 2021, following repeated failed efforts to further engage Defendants in effectuating the Operating Agreement's buyout option and obtain their cooperation, Plaintiffs offered to Bill Orner and the Crossover artist he represents the opportunity to purchase Plaintiffs' combined 40% interest in the company under the terms previously offered to Defendants. Without Defendants' engagement, cooperation, or assistance in the buy-out discussions, Mr. Orner declined Plaintiffs' offer on behalf of himself and the Crossover artist he represents.

81.    Defendants have flagrantly violated the terms and conditions of the parties' Operating Agreement, including the December 22, 2016, amendment.

82.    In order to accomplish the allegations described in this Complaint, Defendants have operated as a *de facto* enterprise, working as if they were one

business with common ownership, common management, and common personnel, and with movement of funds from one entity to the other.

83.     At all times, Plaintiffs have remained in full compliance with the terms and conditions of the Operating Agreement, including the December 22, 2016, amendment.

## III.    CAUSES OF ACTION

### COUNT I:
### BREACH OF CONTRACT

84.     Plaintiffs incorporate paragraphs 1 through 83 of this Complaint as though fully restated herein.

85.     The Operating Agreement, as amended, is a valid and enforceable contract.

86.     As alleged herein, Defendants have refused to comply with the terms and conditions of the Operating Agreement, including the amendment, despite Plaintiffs' multiple demands, in at least the following myriad ways, *inter alia*:

   a. Defendants unilaterally changed Crossover's territorial/team representation philosophy without seeking or obtaining the unanimous consent of the members or a supermajority of the board of directors;

   b. Defendants, without notice to, approval from, or the unanimous consent of Plaintiffs, changed Crossover's member-managed corporate structure, where the four members had collective control over company decisions, to a manager-managed corporate structure and began making unilateral company decisions;

c.  Defendants failed to make distributions of the company to Plaintiffs in accordance with the Operating Agreement's schedule and interest terms and gave priority to themselves;

d.  Defendants failed to regularly meet in person with Plaintiffs or convene semi-annual board meetings;

e.  Defendants made unilateral company decisions from 2020 through present, with regard to Crossover's budget and otherwise, without all members present;

f.  Defendants failed to devote the necessary time and attention to promote Crossover's territorial/team representation model;

g.  Defendants, without first obtaining the unanimous consent of Crossover's members from 2020 through present, incurred company liabilities over $10,000 and single transaction expenses over $5,000 in the operation of Crossover's business per its financial documents;

h.  Defendants, without first obtaining the unanimous consent of Crossover's members from 2020 through present, hired more than one employee with an annual compensation over $30,000;

i.  Defendants sought to acquire Plaintiffs' combined interest in Crossover without obtaining a fair market value appraisal conducted by an independent accounting firm agreed to by all members in accordance with generally accepted accounting procedures;

j.  Defendants commingled Crossover's funds amongst their own with regard to compensation for their services and payment for attorney's and other fees related to their endeavors to dissociate with Plaintiffs;

k.  Defendants failed to keep accurate and complete books of account of the transactions of the company;

l.  Defendants refused to allow Plaintiffs to inspect Crossover's operations account and accounting records regarding the status of the business and the financial condition of the company;

m. Defendants failed to furnish Plaintiffs with an annual financial report showing a full and complete account of the condition of the company, projected income reports for 2021 and 2022, Crossover's SVOG application, or their requested audit of Crossover's books;

n.  Defendants failed to operate Crossover within a financial budget approved annually by the members from 2020 through present;

o.  Defendants borrowed money, in one instance up to $255,000.00, without first obtaining the members' unanimous consent or the board's supermajority vote;

p.  Defendants took distributions without making distributions to Plaintiffs from 2020 through present;

q.  Defendants took unauthorized draws and payroll disbursements;

r.  Defendants failed to repay accumulated debt owed to Plaintiffs within 4 years of December 22, 2016;

s.  Defendants unilaterally changed and increased their compensation structure from 2020 through present without first obtaining Plaintiffs' authorization;

t.  Defendants, without notice to, approval from, or the unanimous consent of Plaintiffs, changed the tax designation of Plaintiffs' guaranteed payments as partners of Crossover; and

u.  Defendants refused to cooperate or engage in any discussions to effectuate the Operating Agreement's buy-out clause.

87.     Defendants' actions are a clear violation of the terms and conditions of the Operating Agreement, and amendment, and as a result thereof, Plaintiffs have incurred damages in an amount to be proven at trial.

88.     Plaintiffs have made multiple attempts at trying to resolve this matter without having to resort to litigation, but Defendants' actions have left Plaintiffs with no other option but to initiate this action. Defendants have acted in bad faith and have caused Plaintiffs unnecessary trouble and expense in having to bring this action, and as a result thereof, pursuant to O.C.G.A. § 13-6-11, Plaintiffs are entitled to recovery of their litigation expenses, including but not limited to their reasonable attorneys' fees.

89.     Defendants' actions show willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care, which would raise the presumption of conscious indifference to consequences, entitling Plaintiffs to an award of punitive damages.

## COUNT II:
## FRAUDULENT MISREPRESENTATION AND CONCEALMENT

90.     Plaintiffs incorporate paragraphs 1 through 83 and 86 of this Complaint as though fully restated herein.

91.     Defendants made false representations regarding, and failed to reveal information material to, Crossover's value and purported insolvency with the intent

to deceive and induce Plaintiffs to forego and/or delay distributions pursuant to the parties' Operating Agreement and to withdraw from Crossover with no or diminutive monetary consideration for the value of Plaintiffs' interest.

92.     Defendants also made false representations regarding their performance of the terms of the Operating Agreement, including Defendants' false assurances as late as January 2021 that Crossover was utilizing a territorial/team representation model in its business practices, with the intent to deceive and induce Plaintiffs to not pursue remedies pursuant to Defendants' breaches and to continue providing and maintaining artists' support to Defendants and Crossover.

93.     Plaintiffs reasonably relied on these misrepresentations as being true.

94.     These misrepresentations were in fact material to Plaintiffs' agreement to forego and/or delay distributions; pursue buy-out options; not pursue remedies pursuant to Defendants' breaches; and continue providing and maintaining artists' support to Defendants and Crossover.

95.     Plaintiffs would not have undertaken such measures if Defendants had not deceived and misled them through Defendants' knowing misrepresentations and concealment.

96.     Defendants owed Plaintiffs a duty to not falsely represent or conceal material information from Plaintiffs.

97.     Defendants' fraudulent misrepresentations and concealments have caused Plaintiffs to suffer damages in an amount to be proven at trial.

98.     Defendants have acted in bad faith and have caused Plaintiffs unnecessary trouble and expense. Accordingly, pursuant to O.C.G.A. § 13-6-11, Plaintiffs are entitled to recovery of their litigation expenses, including but not limited to, their reasonable attorneys' fees.

99.     In making the material misrepresentations and omissions to Plaintiffs, Defendants showed willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care, which would raise the presumption of conscious indifference to consequences, entitling Plaintiffs to an award of punitive damages.

## COUNT III:
## BREACH OF FIDUCIARY DUTY

100.     Plaintiffs incorporate paragraphs 1 through 83 and 86 of this Complaint as though fully restated herein.

101.     Defendants owed Plaintiffs a fiduciary duty and a duty of good faith, fidelity, and loyalty.

102.     By their wrongful acts and omissions, including but not limited to those acts and omissions described herein, Defendants tortiously and wrongfully breached their duties to Plaintiffs.

28

103.     As a direct and proximate result of Defendants' breaches, Plaintiffs have suffered damages in an amount to be proven at trial. Defendants have acted in bad faith and have caused Plaintiffs unnecessary trouble and expense. Accordingly, pursuant to O.C.G.A. § 13-6-11, Plaintiffs are entitled to recovery of their litigation expenses, including but not limited to their reasonable attorneys' fees.

104.     Defendants' actions show willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care, which would raise the presumption of conscious indifference to consequences, entitling Plaintiffs to an award of punitive damages.

## COUNT IV:
## TORTIOUS INTERFERENCE WITH CONTRACTUAL AND/OR BUSINESS RELATIONS

105.     Plaintiffs incorporate paragraphs 1 through 83 of this Complaint as though fully restated herein.

106.     As alleged herein, Crossover had valid contractual and/or business relationships with at least six (6) high-revenue-generating artists that terminated their representation with Crossover, or were terminated by Defendants, as a result of Defendants' unilateral and unauthorized transition from a territorial/team representation model to an agent-centric model, which negatively impacted the number of bookings the artists received.

29

107. Defendants intentionally and unjustifiably interfered with and disrupted those relationships and induced and/or forced those clients to sever their contracts and discontinue their business relationships with Crossover, which financially impacted Plaintiffs.

108. In doing so, Defendants acted improperly and without privilege, and purposely and maliciously with the intent to injure.

109. Plaintiffs had the expectancy of continuing business relationships with the Crossover clients that Defendants induced and/or forced to sever their contracts.

110. As a direct and proximate result of Defendants' actions, Plaintiffs have suffered financial injury in an amount to be proven at trial.

111. As a direct and proximate result of Defendants' interference, Plaintiffs have suffered and will continue to suffer financial injury, and Plaintiffs will be directly deprived of any future revenues deriving from each opportunity, as well as the additional benefits and credibility that would have accrued to them as a result of successfully managing those opportunities.

112. In addition, Defendants have acted in bad faith and have caused Plaintiffs unnecessary trouble and expense. Accordingly, pursuant to O.C.G.A. §

13-6-11, Plaintiffs are entitled to recovery of their litigation expenses, including but not limited to their reasonable attorneys' fees.

113.     Defendants' actions show willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care, which would raise the presumption of conscious indifference to consequences, entitling Plaintiffs to an award of punitive damages.

**COUNT V:**
**CONVERSION**

114.     Plaintiffs incorporate paragraphs 1 through 83 and 86 of this Complaint as though fully restated herein.

115.     According to the parties' Operating Agreement, a member's interest in Crossover "will be considered personal property." Defendants—without authorization—appropriated, and assumed and exercised dominion over, the personal property of Plaintiffs, inconsistent with Plaintiffs' rights.

116.     Defendants converted for their own use and are in possession of property belonging to Plaintiffs, including, but not limited to, their interest in the value of Crossover and their collective control over company decisions.

117.     Plaintiffs repeatedly demanded the return of their financial and decision-making interest in Crossover, which Defendants have refused to do.

31

118.    Accordingly, Defendants are liable to Plaintiffs for the tort of conversion.

119.    As a direct and proximate result of Defendants' actions, Plaintiffs have suffered financial injury in an amount to be proven at trial.

120.    Defendants have acted in bad faith and have caused Plaintiffs unnecessary trouble and expense. Accordingly, pursuant to O.C.G.A. § 13-6-11, Plaintiffs are entitled to recovery of their litigation expenses, including but not limited to their reasonable attorneys' fees.

121.    Defendants' actions show willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care, which would raise the presumption of conscious indifference to consequences, entitling Plaintiffs to an award of punitive damages.

**COUNT VI:**
**UNJUST ENRICHMENT**

122.    Plaintiffs incorporate paragraphs 1 through 83 and 86 of this Complaint as though fully restated herein.

123.    As alleged herein, Defendants have received the benefits of Plaintiffs' substantial investment, work, client rosters, and unpaid or delayed distributions. Defendants have failed and refused to compensate Plaintiffs for the referenced benefits.

124.    As a direct and proximate result, Defendants received the referenced benefits at the expense of Plaintiffs and, thus, have been and continue to be unjustly enriched.

125.    Consequently, as a direct and proximate result of Defendants' receipt and retention of the referenced benefits, Plaintiffs are entitled to restitution, which justice and equity require, in an amount to be proven at trial.

126.    Defendants have acted in bad faith and have caused Plaintiffs unnecessary trouble and expense. Accordingly, pursuant to O.C.G.A. § 13-6-11, Plaintiffs are entitled to recovery of their litigation expenses, including but not limited to their reasonable attorneys' fees.

127.    Defendants' actions show willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care, which would raise the presumption of conscious indifference to consequences, entitling Plaintiffs to an award of punitive damages.

### COUNT VII:
### CIVIL CONSPIRACY/AIDING AND ABETTING

128.    Plaintiffs incorporate paragraphs 1 through 83 of this Complaint as though fully restated herein.

129.    Through unlawful means, Defendants acted in concert to damage Plaintiffs and breach duties owed to Plaintiffs.

130.    Acting together, Defendants engaged in the tortious conduct described in the foregoing Counts and alleged herein in order to damage Plaintiffs.

131.    Each Defendant aided and abetted the unlawful acts of the other Defendants, including breaches of duties owed Plaintiffs.

132.    As a direct result of Defendants' conspiracy and aiding and abetting, Plaintiffs have suffered damages in an amount to be proven at trial.

133.    Defendants have acted in bad faith and have caused Plaintiffs unnecessary trouble and expense. Accordingly, pursuant to O.C.G.A. § 13-6-11, Plaintiffs are entitled to recovery of their litigation expenses, including but not limited to their reasonable attorneys' fees.

134.    Defendants' actions show willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care, which would raise the presumption of conscious indifference to consequences, entitling Plaintiffs to an award of punitive damages.

### COUNT VIII:
### INJUNCTIVE RELIEF

135.    Plaintiffs incorporate paragraphs 1 through 83 and 86 of this Complaint as though fully restated herein.

136.    If Defendants continue their actions of failing to pay amounts due and owing to Plaintiffs; commingling Crossover funds with their own; unilaterally

spending Crossover funds without approval or authorization; and failing to provide all requested financial records of accounting relevant to the company, Plaintiffs will suffer irreparable injury, including losing their ability to operate as member-managers of their own business.

137.    Plaintiffs are extremely likely to prevail on the merits of this matter.

138.    Defendants will not suffer any irreparable injury in being required to simply comply with the terms and conditions of the parties' Operating Agreement.

139.    The public interest will be served by requiring Defendants to comply with the terms and conditions of the parties' Operating Agreement.

140.    Pursuant to Federal Rule of Civil Procedure 65, Plaintiffs are entitled to an injunction to enjoin Defendants from commingling Crossover funds with their own and spending Crossover funds without Plaintiffs' approval or authorization; and to direct Defendants to pay all amounts due and owing to Plaintiffs and produce all requested financial records of accounting relevant to the company.

## COUNT IX:
## SPECIFIC PERFORMANCE

141.    Plaintiffs incorporate paragraphs 1 through 83 and 86 of this Complaint as though fully restated herein.

142.     As alleged, Defendants have intentionally violated the terms and conditions of the Operating Agreement, including the amendment, in the numerous ways set forth herein.

143.     Pursuant to O.C.G.A. § 23-2-130, Plaintiffs are entitled to specific performance of the parties' Operating Agreement where damages recoverable at law would not be an adequate compensation for Defendants' nonperformance.

## IV.    PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully pray that the Court:

a.  Issue an injunction to enjoin Defendants as herein requested;

b.  Set down at the earliest possible time a hearing on Plaintiffs' request for injunctive relief;

c.  Require Defendants to specifically perform in accordance with the Operating Agreement;

d.  Grant Plaintiffs all damages incidental to the injunctive relief they now seek and to which they are entitled;

e.  Grant Plaintiffs a trial by jury for damages;

f.  Enter judgment in favor of Plaintiffs and against Defendants on all counts of the Complaint;

g.  Award Plaintiffs compensatory, exemplary, punitive, and any enhanced damages allowed by law or authorized by statute, rule, or regulation arising out of Defendants' misconduct, violations, torts, and breaches in amounts to be determined by a jury;

h.  Order that Defendants be divested of any interest in property rightfully owned or possessed by Plaintiffs;

i.  Award Plaintiffs prejudgment interest on all amounts awarded;

j.  Award Plaintiffs restitution, disgorgement, and all other forms of equitable monetary relief;

k.  Assess Defendants for Plaintiffs' reasonable attorneys' fees, expenses, and costs of suit for Defendants' bad faith, stubborn litigiousness, and causation of unnecessary trouble and expense pursuant to O.C.G.A. § 13-6-11;

l.  Cast all costs against Defendants; and

m.  Grant Plaintiffs such other and further relief as is justified by the facts and law that this Court deems just and proper.

## V.    DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiffs

demand a trial by jury on all issues so triable.

Respectfully submitted, this 2nd day of April, 2022.

*/s/ Michael J. Moore*
MICHAEL J. MOORE
Georgia Bar No. 520109
AIMEE J. HALL
Georgia Bar No. 318048
**Moore Hall, LLC**
3630 Peachtree Road NE, Suite 1025
Atlanta, GA 30326
(404) 882-2960
mjmoore@moorehall.com
ajhall@moorehall.com

*Attorneys for Plaintiffs*

38

## VERIFICATION

I, Robert S. Strickland, personally appeared before the undersigned attesting

officer authorized by law to administer oaths, and after being duly sworn, declare

under oath that I am the Petitioner in the above-styled action and that the facts

stated in the foregoing Complaint are true and correct to the best of my knowledge.

Signed this ____ day of ____ April ____, 2022.

ROBERT S. STRICKLAND
1920 Floresta View Dr
Tampa, Florida 33618
(813) 732-4915

Sworn to and affirmed before me,
this ____ day of April 22 .

_____
NOTARY PUBLIC
My commission expires: 1-6-25

(Notary Seal)



RACHEL GALLAHER
MY COMMISSION # HH 78032
EXPIRES: January 6, 2025

## VERIFICATION

I, Delano F. McCoury, personally appeared before the undersigned attesting

officer authorized by law to administer oaths, and after being duly sworn, declare

under oath that I am the Petitioner in the above-styled action and that the facts

stated in the foregoing Complaint are true and correct to the best of my knowledge.

Signed this ___/___ day of ___APRIL___, 2022.

_Delano F. McCoury_
DELANO F. MCCOURY
562 Forest Retreat Road
Hendersonville, Tennessee 37075-2246
(615) 338-4466


Sworn to and affirmed before me,
this ___1___ day of ___APRIL, 2022___.

_Jon McGlathery_
NOTARY PUBLIC
My commission expires: ___9/25/2024___

(Notary Seal)

JON MCGLATHERY
STATE OF
TENNESSEE
NOTARY
PUBLIC
SUMNER COUNTY
My Commission Expires Sept. 25, 2024

**40**

# EXHIBIT A

## OPERATING AGREEMENT

**This Operating Agreement** (the "Agreement") made and entered into this 11th day of August, 2013 (the "Execution Date"),

**AMONGST**

All Blues Inc. of 308 River Glen Drive Roswell Ga 30075,
Triple R Holdings LLC (562 forest retreat road Hendersonville Tn 37075)
Blessing In The Sky LLC (400 N. Ashley Dr Suite 2600 Tampa Fl 33602), and
Unlimited Devotion IN160 Milton St. Portland Me 04103

(individually the "Member" and collectively the "Members").

**BACKGROUND**

A. The Members wish to associate themselves as members of a limited liability company.

B. The terms and conditions of this Agreement will govern the members within the limited liability company.

**IN CONSIDERATION OF** and as a condition of the Members entering into this Agreement and other valuable consideration, the receipt and sufficiency of which is acknowledged, the parties to this Agreement agree as follows:

### Formation

1. By this Agreement the Members form a Limited Liability Company (the "Company") in accordance with the laws of the State of Georgia. The rights and obligations of the Members will be as stated in the Georgia Limited Liability Company Act (the "Act") except as otherwise provided here.

### Name

2. The name of the Company will be Crossover Touring LLC.

### Purpose

3. Negotiating and contracting live engagements for an exclusive roster of clients.

### Term

4. The Company will continue until terminated as provided in this Agreement or may dissolve under conditions provided in the Act.

**Place of Business**

5. The Principal Office of the Company will be located at One West Court Square, Suite 750 Decatur, GA 30030 or such other place as the Members may from time to time designate.

**Capital Contributions**

6. The following is a list of all Members and their Initial Capital Contributions to the Company. Each of the Members agree to make their Capital Contributions to the Company, full and on time, according to the following terms:

| Member | Contribution Description | Value of Contribution | Delivery Date |
|---|---|---|---|
| Barron Ruth<br><br>(all Blues Inc | This Member will bring clients that generate the majority of the initial of the revenue for the agency. Approximately $350,000 to $400,000 in earnings in year one. This Member shall be listed as Agent/Partner and will be charged with creating and executing the vision of Crossover Touring LLC in conjunction with all members of the LLC. | $0.00 | 22 Aug 2013 |
| Blessing In The Sky LLC | $50,000 cash plus he will serve as advisor to President in all operations. | $50,000.00 | 23 October 2013<br><br>(full amount) |
| Triple R Holdings LLC | $100,000 | $100,000.00 | 23 October 2013<br><br>(full amount) |
| Unlimited devotion inc | This Member will bring approximately $200,000 in annual commissions to the | $0.00 | 22 Aug 2013 |

| Pat May | organization. This Member is responsible for booking and signing clients, as well as shaping the culture of the agency. | | |
|---|---|---|---|

**Distribution of Profits/Losses**

7. Subject to the other provisions of this Agreement, the Net Profits or Losses of the Company, for both accounting and tax purposes, will be distributed between the Members in the following manner:

| Member | Profit/Loss Percentage |
|---|---|
| All Blues Inc. (barron ruth) | 40.00% |
| Blessing In The Sky LLC | 20.00% |
| Triple R Holdings LLC | 20.00% |
| Unlimited Devotion Inc (Pat May) | 20.00% |

8. Distributions will be made according to the following schedule: 20% of Gross Income to Blessing In The Sky LLC;
20% of Gross Income to Triple R Holdings LLC; and
60% to be held by Barron Ruth and Pat May to run the business operations and be compensated for their results via commissions plus equity.

9. Tax Allocations will be made in the same fixed proportions as the allocation of Net Profits or Losses described above.

10. No Member will have priority over any other Member for the distribution of Net Profits or Losses.

**Voting**

44

11. Each Member will have a single equal vote on any matter.

## Nature of Interest

12. A Member's interest in the Company will be considered personal property, and will at no time be considered real property.

13. A Member's ownership interest in the Company will be represented by a certificate issued by the Company.

## Withdrawal of Contribution

14. No Member will withdraw any portion of their Capital Contribution without the unanimous consent of the other Members.

## Liability for Contribution

15. A Member's obligation to make their required Capital Contribution can only be compromised or released with the consent of all remaining Members or as described elsewhere in this Agreement. If a Member does not make the Capital Contribution when it is due, he is obligated at the option of the remaining Members to contribute cash equal to the agreed value of the Capital Contribution. This option is in addition to and not in lieu of any others rights, including the right to specific performance that the Company may have against the Member.

## Additional Contributions

16. Capital Contributions may be amended from time to time, according to the requirements of the Company provided that the Members' interests are not affected, except with the unanimous consent of the Members. No Member will be required to make Additional Contributions. Whenever additional capital is determined to be required and an individual Member is unwilling or unable to meet the additional contribution requirement within a reasonable period, as required by business obligations, the remaining Members may contribute in proportion to their existing Capital Contributions to resolve the amount in default. In such case the allocation of Net Profits or Losses of the Company among all the Members may be adjusted to reflect the aggregate change in Capital Contributions by the Members.

17. Any advance of money to the Company by any Member in excess of the amounts provided for in this Agreement or subsequently agreed to, will be deemed a debt due from the Company rather than an increase in the Capital Contribution of the Member. This liability will be repaid with interest at such rates and times to be determined by a majority of the Members. This liability will not entitle the lending Member to any increased share of the Company's profits nor to a greater

voting power. Resolution of such debts may have preference or priority over any other payments to Members as may be determined by a majority of the Members.

### Capital Accounts

18. An individual capital account will be maintained for each Member and their initial Capital Contribution will be credited to this account. Any Additional Contributions made by any Member will be credited to that Member's individual Capital Account.

### Interest on Capital

19. No borrowing charge or loan interest will be due or payable to any Member on their agreed Capital Contribution inclusive of any agreed Additional Contributions.

### Drawing Accounts

21. An individual drawing account will be maintained for each Member. Each Member will be entitled to draw against their share of the profits in such amounts and at such time as will be agreed by the Members. The drawing account is a temporary account and is expected to have a debit balance if there have been any withdrawals. At the end of each accounting year, the drawing accounts are closed by transferring the debit balance to each Member's capital account. Members will be compensated by the Company for services rendered to or on behalf of the Company.

### Management

22. Management of this Company is vested in the Members.

### Authority to Bind Company

23. Only the following individuals have authority to bind the Company in contract: Barron Ruth and Pat May. Barron Ruth and Pat May will issue performance contracts for the artist roster. Pat May and Barron Ruth may sign binding contracts for the purposes of maintaining infrastructure for Crossover Touring. Stan Strickland and Del McCoury may sign contracts related to investments approved by all members.

### Duty of Loyalty

All members shall maintain loyalty to Crossover Touring but recognize that they are members of other organizations such as DelFest LLC where they will not deviate from their normal management function (i.e. select artists based on the merit of the artists not because of their agency affiliation). All members of

Crossover Touring LLC must take into consideration the purpose of each individual organization's goals and actions and act accordingly. No member may be an owner or board member in a similar agency with similar philosophies or genres. Crossover Touring must earn the right to work with said organizations based on the merits of the artist they represent. If Pat May or Barron Ruth leave Crossover Touring with their artists then they would forfeit their equity position and the remainder of their equity would be split equally with the other members. If Barron Ruth or Pat May leave Crossover Touring but their artists stay with the agency, then they would retain their equity. Any member that chooses to leave agrees to offer their equity positions for sale at the most favorable rate.

### Duty to Devote Time

25. Each Member will devote such time and attention to the business of the Company as the majority of the Members will from time to time reasonably determine for the conduct of the Company business.

### Member Meetings

26. Member meetings will be held at the following address, or any other location that the Members may from time to time designate: in the principal office or as designated by Members. Members may elect to hold phone meetings and vote verbally or by email.

27. Any impending live Member meeting will require 30 days notice be given to all

28. A meeting may be called by any Member providing that appropriate notice has been provided to the other Members.

29. Regular Member meetings will be held according to the following schedule: January and July of each calendar year or as otherwise designated.

30. All Members, or their legal proxies, must be present at a meeting for any decisions to be binding. If the minimum number of Members are not present at the meeting, actions may still be taken by the present Members if prior written consent of the absent Members has been obtained.

### Admission of New Members

31. No new Members may be admitted into the Company.

### Dissociation of a Member

33. Voluntary Withdrawal: No Member may voluntarily withdraw from the Company for a period of 3 months from the execution date of this Agreement. After the

expiration of this period, any Member (the "Dissociated Member") will have the right to voluntarily withdraw from the Company at the end of any fiscal year. Written notice of intention to withdraw must be served upon the remaining Members at least 30 days prior to the fiscal year end. The withdrawal of such Member will have no effect upon the continuance of the Company business. If the remaining Members elect to purchase the interest of the withdrawing Member, the Members will serve written notice of such election upon the withdrawing Member within thirty (30) days after receipt of the withdrawing Member's notice of intention to withdraw, including the purchase price and method and schedule of payment for the withdrawing Member's interest. The purchase amount of any buyout of a Member's interest will be determined as outlined in the Valuation of Interest section of this Agreement. It remains incumbent on the withdrawing Member to exercise this right in good faith and to minimize any present or future harm done to the remaining Members as a result of the withdrawal **to?**)  It is herbey acknowledged that Blessings in the Sky (Stan Strickland and Rainmaker Management) manage artists that for various reasons may be represented by other booking agencies.

34. Involuntary Withdrawal: Events leading to the involuntary withdrawal of a Member (the "Dissociated Member") from the Company will include but not be limited to: death of a Member (Robyn or Ronald McCoury may be designated as a replacement for Del McCoury); Member mental incapacity; (Robyn or Ronald McCoury may be designated as a replacement for Del McCoury)Member disability preventing reasonable participation in the Company (Robyn or Ronald McCoury may be designated as a replacement for Del McCoury); Member incompetence; breach of fiduciary duties by a Member; criminal conviction of a Member; Operation of Law against a Member or a legal judgment against a Member that can reasonably be expected to bring the business or societal reputation of the Company into disrepute. Expulsion of a Member can also occur on application by the Company or another Member, where it has been judicially determined that the Member: has engaged in wrongful conduct that adversely and materially affected the Company's business; has willfully or persistently committed a material breach of the Operating Agreement or of a duty owed to the Company or to the other Members; or has engaged in conduct relating to the Company's business that makes it not reasonably practicable to carry on the business with the Member. The withdrawal of such Member will have no effect upon the continuance of the Company business. If the remaining Members elect to purchase the interest of the withdrawing Member, the remaining Members will serve written notice of such election, including the purchase price and method and schedule of payment for the withdrawing Member's interest, upon the withdrawing Member, their executor, administrator, trustee, committee or analogous fiduciary within a reasonable period after acquiring knowledge of the change in circumstance to the affected Member. The purchase amount of any buyout of a Member's interest will be determined as outlined in the Valuation of Interest section of this Agreement.

34. On any purchase and sale made pursuant to this section, a Dissociated Member will only have liability for Company obligations that were incurred during their time as a Member. Immediately upon purchase of a withdrawing Member's interest, the Company will prepare, file, serve, and publish all notices required by law to protect the withdrawing Member from liability for future Company obligations. Where the remaining Members have purchased the interest of a dissociated member, the purchase amount will be paid in full, but without interest, within 90 days of the date of withdrawal. The Company will retain exclusive rights to use of the trade name and firm name and all related brand and model names of the Company.

35. The remaining Members retain the right to seek damages from a dissociated Member where the dissociation resulted from a malicious or criminal act by the dissociated Member or where the dissociated Member had breached their fiduciary duty to the Company or was in breach of this Agreement or had acted in a way that could reasonably be foreseen to bring harm or damage to the Company or to the reputation of the Company.

### Buyout Agreement

36. In the event of a Member's interest in the Company becoming for sale, due to any reason, the remaining Members of the Company have a right of first purchase on the interest. The value of the interest in the Company will be determined as outlined in the Valuation of Interest section of this Agreement.

### Assignment of Interest

37. A Member may voluntarily assign their financial interest in the Company to another party. An assignment of the financial interest does not include an assignment of any management duties, obligations to contribute, or any other rights other than the right to receive the distribution. An assignment of full Membership status inclusive of all duties, obligations, and rights previously held by the assigning Member will not be allowed under this Agreement.

38. Where a Member's financial interest in the Company is assigned to another party, that Member forfeits any duties and rights arising from their status as a Member and those duties and rights will not be passed to the acquiring party. Obligations to contribute are not negated by this forfeiture.

### Valuation of Interest

39. In the absence of a written agreement setting a value, the value of the Company will be based on the fair market value appraisal of all Company assets (less liabilities) determined in accordance with generally accepted accounting procedures. This appraisal will be conducted by an independent accounting firm agreed to by all Members. An appraiser will be appointed within a reasonable

period of the date of withdrawal or dissolution. The results of the appraisal will be binding on all Members. A withdrawing Member's interest will be in proportion to their profit and loss share in the Company, less any outstanding liabilities a Member may have to the Company. The intent of this section is to ensure the survival of the Company despite the withdrawal of any individual Member. Valuation will be defined as 2.5 to 3 times members average annual earnings.

40. No allowance will be made for goodwill, trade name, patents or other intangible assets, except where those assets have been reflected on the Company books immediately prior to valuation.

**Dissolution**

42. The Company may be dissolved by a unanimous vote of the Members. The Company will also be dissolved on the occurrence of events specified in the Act. Filing Bankruptcy shall also require a unanimous vote of the members, or 5 out of 7 board members.

43. Upon Dissolution of the Company and liquidation of Company property, and after payment of all selling costs and expenses, the liquidator will distribute the Company assets to the following groups according to the following order of priority:

   a. in satisfaction of liabilities to creditors except Company obligations to current Members;

   b. in satisfaction of Company obligations to current Members to pay debts; and

   c. to the Members in proportion to their profit and loss share in the Company.

43. The claims of each priority group will be satisfied in full before satisfying any claims of a lower priority group. Any excess of Company assets after liabilities or any insufficiency in Company assets in resolving liabilities under this section will be resolved by the Members in proportion to the profit and loss share of each Member as set out in this Agreement.

**Records**

44. The Company will at all times maintain accurate records of the following:

   a. Information regarding the status of the business and the financial condition of the Company.

    c.  A copy of the Company federal, state, and local income taxes for each year (promptly after becoming available   Name and last known business, residential, or mailing address of each Member, as well as the date that person became a Member.

    d.  A copy of this Agreement and any articles or certificate of formation, as well as all amendments, together with any executed copies of any written powers of attorney pursuant to which this Agreement, articles or certificate, and any amendments have been executed.

    e.  The cash, property, and services contributed to the Company by each Member, along with a description and value, and any contributions that have been agreed to be made in the future.

45. Each Member has the right to demand, within a reasonable period of time, a copy of any of the above documents for any purpose reasonably related to their interest as a Member of the Company, at their expense.

### Books of Account

46. Accurate and complete books of account of the transactions of the Company will be kept and at all reasonable times be available and open to inspection and examination by any Member. The Books of Account will be kept on the cash basis method of accounting.

### Banking and Company Funds

47. The funds of the Company will be placed in such investments and banking accounts as will be designated by the Members. All withdrawals from these accounts will be made by the duly authorized agent or agents of the Members as agreed by unanimous consent of the Members. Company funds will be held in the name of the Company and will not be commingled with those of any other person or entity. Investing of the company's money will only be executed by a unanimous vote, or by a 5/7ths vote of the board of directors.   Artist Deposit account will be maintained for artist funds and will not be co-mingled with other accounts.

### Audit

48. Any of the Members will have the right to request an audit of the Company books. The cost of the audit will be borne by the Company. The audit will be performed by an accounting firm acceptable to all the Members. Not more than one (1) audit will be required by any or all of the Members for any fiscal year.

### Fiscal Year End

49. The fiscal year end of the Company is the 31st day of Dec.

**Tax Treatment**

50. This Company is intended to be treated as a limited liability corporation, for the purposes of Federal and State Income Tax.

**Annual Report**

51. As soon as practicable after the close of each fiscal year, the Company will furnish to each Member an annual report showing a full and complete account of the condition of the Company including all information as will be necessary for the preparation of each Member's income or other tax returns. This report will consist of at least:

   a. A copy of the Company's federal income tax returns for that fiscal year.

   b. Supporting income statement.

   c. A balance sheet.

   d. A cash flow statement.

   e. A breakdown of the profit and loss attributable to each Member.

**Goodwill**

52. The goodwill of the Company will be assessed at an amount to be determined by appraisal using generally accepted accounting procedures.

**Governing Law**

53. The Members submit to the jurisdiction of the courts of the State of Georgia for the enforcement of this Agreement or any arbitration award or decision arising from this Agreement.

**Mediation and Arbitration**

54. In the event a dispute arises out of or in connection with this Agreement, the parties will attempt to resolve the dispute through friendly consultation. If the dispute is not resolved within a reasonable period then any or all outstanding issues may be submitted to mediation in accordance with any statutory rules of mediation. If mediation is not successful in resolving the entire dispute or is unavailable, any outstanding issues will be submitted to final and binding arbitration in accordance with the laws of the State of Georgia. The arbitrator's award will be final, and judgment may be entered upon it by any court having jurisdiction within the State of Georgia.

### Force Majeure

55. A Member will be free of liability to the Company where the Member is prevented from executing their obligations under this Agreement in whole or in part due to force majeure, such as earthquake, typhoon, flood, fire, and war or any other unforeseen and uncontrollable event where the Member has communicated the circumstance of the event to any and all other Members and where the Member has taken any and all appropriate action to satisfy his duties and obligations to the Company and to mitigate the effects of the event.

### Forbidden Acts

56. No Member may do any act in contravention of this Agreement.

57. No Member may permit, intentionally or unintentionally, the assignment of express, implied or apparent authority to a third party that is not a Member of the Company.

58. No Member may commit any act that would make it impossible to carry on the ordinary business of the Company.

59. No Member will have the right or authority to bind or obligate the Company to any extent with regard to any matter outside the intended purpose of the Company.

60. No Member may confess a judgment against the Company.

61. Any violation of the above forbidden acts will be deemed an Involuntary Withdrawal of the offending Member and may be treated accordingly by the remaining Members.

### Indemnification

62. All Members will be indemnified and held harmless by the Company from and against any and all claims of any nature, whatsoever, arising out of a Member's participation in Company affairs. A Member will not be entitled to indemnification under this section for liability arising out of gross negligence or willful misconduct of the Member or the breach by the Member of any provisions of this Agreement.

### Liability

63. A Member or any employee will not be liable to the Company or to any other Member for any mistake or error in judgment or for any act or omission believed in good faith to be within the scope of authority conferred or implied by this

Agreement or the Company. The Member or employee will be liable only for any and all acts and omissions involving intentional wrongdoing.

### Liability Insurance

64. The Company may acquire insurance on behalf of any Member, employee, agent or other person engaged in the business interest of the Company against any liability asserted against them or incurred by them while acting in good faith on behalf of the Company.

### Life Insurance

65. The Company will have the right to acquire life insurance on the lives of any or all of the Members, whenever it is deemed necessary by the Company. Each Member will cooperate fully with the Company in obtaining any such policies of life insurance.

### Actions Requiring Unanimous Consent

66. The following actions will require the unanimous consent of all Members:

    a.   Incurring Company liabilities over $10,000.

    b.   Incurring a single transaction expense over $5,000.00.

    c.   The sale of any Company asset with a fair market value over $1,000.00.

    d.   Hiring an employee with an annual compensation over $30,000.00.

    e.   Assignment of ownership rights of Company property.

    f.   Endangering the ownership or possession of Company property.

    G.   Releasing any Company claim except for payment in full.

### Amendment of Operating Agreement

67. This operating agreement can be amended by unanimous consent of the 4 members, or by a 5 of 7 vote by the board.

68. Amendment of this section or the Voting section will require the unanimous written consent of all Members.

### Title to Company Property

69. Title to all Company property will remain in the name of the Company. No Member or group of Members will have any ownership interest in Company property in whole or in part.

**Miscellaneous**

70. Time is of the essence in this Agreement.

71. This Agreement may be executed in counterparts.

72. Headings are inserted for the convenience of the parties only and are not to be considered when interpreting this Agreement. Words in the singular mean and include the plural and vice versa. Words in the masculine gender include the feminine gender and vice versa. Words in a neutral gender include the masculine gender and the feminine gender and vice versa.

73. If any term, covenant, condition or provision of this Agreement is held by a court of competent jurisdiction to be invalid, void or unenforceable, it is the parties' intent that such provision be reduced in scope by the court only to the extent deemed necessary by that court to render the provision reasonable and enforceable and the remainder of the provisions of this Agreement will in no way be affected, impaired or invalidated as a result.

74. This Agreement contains the entire agreement between the parties. All negotiations and understandings have been included in this Agreement. Statements or representations that may have been made by any party to this Agreement in the negotiation stages of this Agreement may in some way be inconsistent with this final written Agreement. All such statements have no force or effect in respect to this Agreement. Only the written terms of this Agreement will bind the parties.

75. This Agreement and the terms and conditions contained in this Agreement apply to and are binding upon the Member's successors, assigns, executors, administrators, beneficiaries, and representatives.

76. Any notices or delivery required here will be deemed completed when hand-delivered, delivered by agent, or seven (7) days after being placed in the post, postage prepaid, to the parties at the addresses contained in this Agreement or as the parties may later designate in writing.

77. All of the rights, remedies and benefits provided by this Agreement will be cumulative and will not be exclusive of any other such rights, remedies and benefits allowed by law.

**Additional Terms**

78. Members agree that the $150,000 cash contribution, by members Del McCoury dba Triple R Holdings LLC and Stan Strickland dba Blessing In The Sky LLC ,is an asset of the company and is not a loan. This shall be in effect for 2014, 2015, and 2016.

79. A 7 person board will be formed, Pat May, Barron Ruth, Blessing In The Sky LLC and Triple R Holdings LLC will all have a seat on the board. Barron Ruth and Pat May will choose one additional member, Blessing In The Sky LLC and Triple R Holdings LLC will choose one additional member. These additional members will pick an additional member whom they agree on. Board meetings will be held as needed but not less than semi-annually, January and July beginning in January 2014 or as designated. Board duties are specifically for strategic direction, acquisition and strategy.

80. No payment above agreed upon agent compensation will be considered to be paid to any of the members until December 2014 and there will be unanimous consent of the members before such payment is distributed, or by 6 of 7 vote of the board of directors. Payments will again be eligible at the conclusion of the 2014 fiscal year. Thereafter member payments will be evaluated at the close of every quarter. Payments will require a unanimous member vote or 6/7ths of the board of directors.

81. Agent compensation will be reviewed July and December every calendar year, beginning in December 2014.  Agent Compensation will be set by Barron Ruth. This will be based on agent's effectiveness as both a territorial agent and Responsible Agent. Partnership bonus beyond percentages specified will be a board decision. Agent compensation will be set on an annual basis and will be paid out of the 60% of the gross revenue that is owned By Barron Ruth and Pat May.

83. Barron Ruth and Pat May will be responsible for the daily operations of Crossover Touring as Agent/Partners. This will include booking artists on the roster and signing clients to Crossover Touring. Blessing In The Sky LLC will also have responsibility in this area of growth but ultimate authority is with Barron Ruth and Pat May. Any disagreement of daily operation between Barron Ruth and Pat May will be taken to Blessing In The Sky LLC for resolution. This shall include budgets for the operation of the company. Barron Ruth will be primary operator of Crossover Touring's Operations account; all members will have the ability to see the account.

84. Change in the general philosophy of the company shall be by unanimous consent of the members or 6/7ths of the board of directors/.

85.  Crossover Touring LLC may borrow money by unanimous consent of the members or 6/7ths of the board of directors.

86. Additional Capitol contributions may be accepted by unanimous consent of the members or 5/7ths of the board of directors.

87. Any decision to pursue litigation by Crossover Touring will be by unanimous consent of the members or by a 5 of 7 vote of the board of directors.

88. There shall be no Tag Along or Drag Along rights unless there is unanimous consent of the members or by 5/7$^{ths}$ of the board of directors.

89. This Operating agreement may only be changed by unanimous vote of the members or 6/7ths of the board of directors.

90. All operating expenses paid out before the capitol contribution shall be paid back to individual members. This includes Rainmaker Productions for cost associated with marketing the agency, Barron Ruth and Pat May for Startup expenses.

### Definitions

For the purpose of this Agreement, the following terms are defined as follows:

    a. "Additional Contribution" means Capital Contributions, other than Initial Contributions, made by Members to the Company.

    b. "Capital Contribution" means the total amount of cash, property, or services contributed to the Company by any one Member.

    c. "Initial Contribution" means Capital Contributions made by any Member to acquire an interest in the Company.

    d. "Net Profits or Losses" means the net profits or losses of the Company as determined by generally accepted accounting principles.

    e. "Operation of Law" means rights or duties that are cast upon a party by the law, without any act or agreement on the part of the individual including, but not limited to, an assignment for the benefit of creditors, a divorce, or a bankruptcy.

    f. "Principal Office" means the office whether inside or outside the State of Georgia where the executive or management of the Company maintain their primary office.

**IN WITNESS WHEREOF** the parties have duly affixed their signatures under hand and seal on this 11th day of August, 2013.

All Blues Inc (Member)

_____

Blessing IN The Sky LLC (Member)

_____

Triple R Holdings LLC (Member)

_____

Unlimited Devotion Inc (Member)

©2002-2013 LawDepot.com™